BENJAMIN BLOCK et al., Individually, and as Copartners under the Firm Name of BLOCK, MALONEY & Co., Appellants, *v.* THE PENNSYLVANIA EXCHANGE BANK, Respondent.

(Argued February 17, 1930; decided March 18, 1930.)

*James Marshall* for appellants. The bank is liable for the purchase price because the defense of *ultra vires* is not available to the bank as the transaction was executed by the plaintiff and was no longer executory. (*Tracy* v. *Talmage,* 14 N. Y. 162; *Messersmith* v. *American Fidelity Co.,* 187 App. Div. 35; *Bissell* v. *Michigan, etc., R. R. Co.,* 22 N. Y. 258; *Appleton* v. *Citizens' Nat. Bank,* 190 N. Y. 417; 216 U. S. 196; *Higgins* v. *Hocking Valley R. Co.,* 188 App. Div. 684; *Holmes & Griggs Mfg. Co.* v. *Holmes & Wessell Metal Co.,* 127 N. Y. 252; *American Surety Co.* v. *Philippine Nat. Bank,* 245 N. Y. 116; *Mullen* v. *Quinlan & Co.,* 195 N. Y. 109; *Content* v. *Banner,* 184 N. Y. 121; *Markham* v. *Jaudon,* 41 N. Y. 235; *National Bank* v. *Case,* 99 U. S. 628; *Riggs* v. *Palmer,* 115 N. Y. 506.) The transactions set forth in the complaint are neither illegal nor *ultra vires* but were incidental to the conduct of the business of banking. (*National Revere Bank* v. *National Bank of Republic,* 172 N. Y. 102; *Allen* v. *Merchants' Bank,* 22 Wend. 215; *Dyer* v. *Broadway Central Bank,* 252 N. Y. 430; *American Surety Co.* v. *Philippine Nat. Bank,* 245 N. Y. 116; *First National Bank* v. *Mott Iron Works,* 258 U. S. 240; *Tracy* v. *Talmage,* 14 N. Y. 162; *Central Nat. Bank* v. *White,* 139 N. Y. 631; *LeMarchant* v. *Moore,* 150 N. Y. 209; *Pepperday* v. *Citizens Nat. Bank,* 38 Atl. Rep. 1030.)

*Max Dorff* and *Louis Greenblatt* for respondent. Unless specially authorized by the Superintendent of Banks, a corporation organized under the banking laws of this State has no power to act as agent for a third party for

the purchase of common stocks in the open market, and such special authorization, if any, must be pleaded. (*Appleton* v. *Citizens' Nat. Bank,* 190 N. Y. 417; *Jemison* v. *Citizens' Sav. Bank,* 122 N. Y. 135; *Whiting* v. *Hudson Trust Co.,* 234 N. Y. 394.) Not only are the transactions alleged in the complaint *ultra vires,* but they are also illegal, void and against public policy, and, therefore, it is immaterial whether they are executory or executed. (*Gause* v. *Commonwealth Trust Co.,* 196 N. Y. 134; *Higgins* v. *Hocking Valley Ry. Co.,* 188 App. Div. 684; *American Surety Co.* v. *Philippine Nat. Bank,* 245 N. Y. 116; *Nassau Bank* v. *Jones,* 95 N. Y. 115; *Jemison* v. *Citizens' Savings Bank,* 122 N. Y. 135; *Talmadge* v. *Pell,* 7 N. Y. 328; *Oelberman* v. *N. Y. & Northern R. R. Co.,* 77 Hun, 332; *Bank of Salina* v. *Alvard,* 31 N. Y. 473; *Marie* v. *Garrison,* 83 N. Y. 14.)

CARDOZO, Ch. J. Plaintiffs, stockbrokers in the city of New York, bought shares of stock and subscription rights on the order of the defendant bank, which " was acting as agent for a third party or parties unknown at said times to the plaintiffs."

The bank declined to accept the certificates when tendered or to pay the purchase price. Upon this, the brokers sold what they had bought, and sued for the deficiency.

The Appellate Division sustained a motion by the defendant to dismiss the complaint upon the authority of its decision in *Dyer* v. *Broadway Central Bank* (225 App. Div. 366), which has been reversed by this court (252 N. Y. 430).

The complaint in the *Dyer* case was silent as to the occasion for the purchase of the shares. The bank was stated to have ordered them; whether for itself or for a customer, the record did not show. Confining ourselves strictly to the case presented, we held that the burden was on the defendant to plead the illegality of the transaction, if illegality there was. Circumstances were sug-

gested in which a purchase would be plainly wrongful, as where the bank was buying for itself in aid of a speculative enterprise. Circumstances were suggested in which a purchase would be plainly rightful, as where it was made to take the place of collateral belonging to the customer and lost or misappropriated by an agent of the bank through negligence or fraud. Other situations more obscure or uncertain were left open for the future. We were asked to suppose a case where the bank in communicating the order was acting as agent for an undisclosed customer, who had supplied it in advance with the moneys requisite for the purchase, or had borrowed them upon a note, the shares to be bought with the proceeds of the loan and to be held in the name of the bank as collateral security. We did not feel ourselves at liberty to make definitive pronouncement as to the legality or illegality of a transaction so purely supposititious. For all that we could know from the record then before us the purchase had been made by the bank, not for the use of a customer, but as a speculative investment, made in such circumstances as to be without support in banking practice, for itself or its directors. At the same time in the opinion by HUBBS, J., we pointed out some of the considerations tending to sustain the transaction if in truth it had been effected for the use of a depositor.

The complaint now at hand has transferred the hypothetical transaction from conjecture to reality. " The defendant was acting as agent for a third party or parties unknown to the plaintiffs." We find nothing in such a statement that bespeaks a departure by the bank from the functions and activities appropriate to banking. " The central function of a commercial bank is to substitute its own credit, which has general acceptance in the business community, for the individual's credit, which has only limited acceptability " (Willis & Edwards, Banking and Business, p. 74). A bank " manufactures credit

by accepting the business paper of its customers as security in exchange for its own bank credit in the form of a deposit account " (Holdsworth, Money and Banking, p. 182). It stands ready to exchange its own credits for those of its customers (Westerfield, Banking Principles and Practice, p. 71; cf. Langston & Whitney, Banking Practice, p. 309; Kniffin, Commercial Banking, vol. 2, p. 511; Fiske, The Modern Bank, p. 154). Whatever is an appropriate and usual incident to this substitution or exchange of credits, instead of being foreign to the functions and activities of banking, is in truth of their very essence. It is the end for which a bank exists.

Indisputably the defendant would have kept within its charter if it had made a loan of money wherewith to enable a customer to buy securities for himself. It could not have done an act more characteristic of the banking business. Having power to loan, it had power as an incident to receive securities as collateral, and to use the proceeds of the loan, if so authorized by the borrower, in acquiring the securities and subjecting them thereafter to its possession and dominion. This would not be doubted if in ordering the securities, it had given up the name of its customer with the result that the brokers would look to the customer as principal. We think its power does not fail where it buys in its own name, the moneys being already in its coffers either through previous deposits or as the proceeds of a discount. We are told that in giving an order in its own name it augments the risk of the transaction. Negligence or mistake in the transmission of the order might lead the customer thereafter to repudiate the purchase, in which event the bank would hold the securities as owner. We may doubt whether the risk would be greatly different if the bank in transmitting the order were to give up the name of its customer as principal. There would go with the order even then an implied warranty of authority, and the customer might repudiate the purchase if there was

a departure from his mandate. But risk without more does not serve as a decisive test of power and legality. The bank might have opened a credit in favor of the brokers, to be availed of by drafts when accompanied by shares of stock. The risk would be substantially the same, yet no one would doubt that the transaction would be within the range of banking power. Every day banks subject themselves to a like risk of liability when upon the instructions of a customer they take up drafts with bills of lading attached. A failure to scrutinize with care the recitals of the documents or a departure in some trifling detail from the letter of the mandate may charge the mandatary with loss or with the obligations of an owner (*Laudisi* v. *American Exchange Nat. Bank*, 239 N. Y. 234; *Lamborn* v. *National Park Bank*, 240 N. Y. 520). Risk of loss there also is when a bank assumes an obligation to establish a credit by cablegram or otherwise with a foreign correspondent (*Richard* v. *American Union Bank*, 241 N. Y. 163; *Richard* v. *Credit Suisse*, 242 N. Y. 346), or accepts checks or coupons for collection (*National Revere Bank* v. *National Bank of Republic*, 172 N. Y. 102), or issues a letter of credit. The test of power in all such cases is not the presence of the risk, or its absence, unless it be so inordinate as to be a speculative enterprise (*Jemison* v. *Citizens Sav. Bank*, 122 N. Y. 135); the test is the relation of the act to that substitution of credits which is of the essence of the banking function. Whatever risk is incidental to the fulfilment of that function, according to the practice of banking as it has developed in these days, is to be accepted and suffered as one of the perils of the business.

There is no question that the practice of banking as it has developed in our day upholds the purchase of securities for the benefit of customers whose deposit accounts are sufficient, as the result of loans or otherwise, to justify the credit. The practice is so general that it may be the subject of judicial notice. In many banks

special departments are organized for that very purpose. All this was elucidated in our opinion in *Dyer* v. *Broadway Central Bank (supra)*. HUBBS, J., writing for the court, reminded us that many depositors are accustomed to deal directly with their banks in the purchase of securities; that the validity of the practice has had tacit recognition in our decisions (*Central Nat. Bank* v. *White*, 139 N. Y. 631; *Le Marchant* v. *Moore*, 150 N. Y. 209); that it has never been questioned by the Superintendent of Banks or other administrative agencies; and that " the transactions of banking in a great financial center are not to be clogged, and their pace slackened, by over-burdensome restrictions " (*Whiting* v. *Hudson Trust Co.*, 234 N. Y. 394, 406; cf. *Empire Trust Co.* v. *Cahan*, 274 U. S. 473, 480). At the same time the case of *Jemison* v. *Citizens Sav. Bank (supra)* was sufficiently distinguished (cf. *Hotchkin* v. *Third Nat. Bank*, 219 Mass. 234). It is enough indeed to recall that a bank for savings, unlike a bank of discount, is merely a depository and not a medium for the exchange of credits. In principle at least, the line of demarcation is not doubtful, however much it may be blurred at times by the encroachments of obscuring facts. On the one side are speculative purchases for the benefit of the bank itself, or in aid of some transaction foreign to the banking function. On the other are transactions where the pledge of the credit of the bank is tributary to an exchange of credit for the accommodation of a customer.

We have considered one set of circumstances in which a purchase of shares for the benefit of a customer is an exercise of banking powers. Not improbably there are others. There is no occasion to develop them. On the other hand, we do not say that there may not be still other situations in which a purchase for a stranger, or even for a customer, would be foreign to any function appropriate to the banking business, and so forbidden by the statute. If such situations can be imagined, there

is nothing on the face of this complaint to give token of their existence.

The judgment and order should be reversed, and the motion denied, with costs in all courts.

POUND, CRANE. LEHMAN, KELLOGG, O'BRIEN and HUBBS, JJ., concur.

Judgment and order reversed, etc.