**STATE ex FULTON v W E HUTTON & CO**

Ohio Appeals, 2nd Dist, Montgomery Co

No 1440. Decided Sept 29, 1937

Matthews & Matthews, Dayton, for plaintiff-appellant.

R. N. Brumbaugh, Dayton, and N. K. Brumbaugh, Dayton, for defendant-appellee.

## OPINION

By GEIGER, J.

This cause is before this court upon appeal from the judgment rendered by the Court of Common Pleas on October 8, 1936, on questions of law.

The amended petition, after setting out the relations of the parties, states that Franklin D. Rice was a vice-president of the Dayton Savings & Trust Company, which fact was well known to the defendant; that on October 27, 1927, said Rice opened an account with the defendant under the name of The Dayton Savings & Trust Company, attention F. D. Rice; that on March 23, 1928, he opened an account with the defendant under the name of Mary V. Rice, and that on September 15, 1928, an account under the name of F. D. Ravenwood.

It is alleged that said accounts were opened by Rice for his own benefit and without the knowledge and consent of the Dayton Savings & Trust Company, and that the defendant knew that Rice traded in said accounts for his own benefit and without the knowledge of the Trust Company, and did not require him to carry on the transactions in his own name; that the defendant accepted from Rice payments for the transactions in treasurer's checks drawn upon the funds of the Trust Company.

The amended petition then sets out a number of transactions alleging the delivery to the defendant of certain treasurer's checks in various sums, which the defendant is alleged to have credited on its books to the account of Rice, carried under the name of Dayton Savings & Trust Company, attention F. D. Rice, and to the accounts carried in the name of Mary V. Rice and F. D. Ravenwood, and that the amount of said checks was received by the defendant for the benefit of Rice, and that said treasurer's checks were endorsed and deposited by defendant in its bank and payments received by it from funds of the Trust Company.

The transactions set out in the petition relate severally to check No. 44308, dated May 17, 1928, for $5,450.00; check No. 44309, dated May 17, 1928, for $900.00, which check is alleged to have been credited to the account of Rice carried under the name of Mary V. Rice; check No. 44315, dated May 18, 1928, for $8,175.00; check No. 44346, dated May 22, 1928, for $22,262.00; check No. 44347, dated May 22, 1928, for $392.00, which was credited to the account carried under the name of Mary V. Rice, check No. 44480, dated August 27, 1928, for $61,962.50, which was credited by the defendant on account of said Rice carried under the name of F. D. Ravenwood; check No. 4018, dated January 19, 1929, for $98,325.00 credited by the defendant to the account of Rice, carried under the name of Mary V. Rice.

It is alleged as to all these checks that they were received for the use and benefit of Rice, a fact known to the defendant, and that payment was received by the defendant from the funds of the Trust Company.

It is alleged that by reason of sundry transactions there was returned to the plaintiff $16,000.00, to which defendant is entitled to credit as against the aggregate of the checks, and that there is now due to the plaintiff from defendant the sum of $181,466.50.

It is alleged that through the transaction by Rice the plaintiff has in its possession twenty-five hundred shares of the Congoleum-Nairn, Inc.; one thousand shares Class B. Continental Baking Company; three thousand shares of Willys-Overland, Inc., which securities it is alleged were deposited by Rice with the Trust Company, without its knowledge or consent, but with the knowledge and consent of defendant. Upon these shares of stock plaintiff says that it has a lien.

For a second cause of action, it is alleged that on December 21, 1929, the defendant was indebted to plaintiff in the sum of $181,466.00 for money had and received for the use of the plaintiff.

Judgment is prayed for in the sum named,

and that the securities be ordered sold and the proceeds applied.

To this petition an answer is filed, the first defense admitting certain matters and generally denying all other allegations.

For a second defense, it is alleged that at all times mentioned in the amended petition, and long prior thereto, the Trust Company was engaged in the business of a Commercial Bank, a Savings Bank, and a Trust Company, and that in furtherance of said purposes it maintained a Commercial Bank Department, a Trust Department, and a Bond Department, and that the Bond Department, was maintained for the purpose of dealing in investment securities for the accommodation of its customers, and said Trust Department; that Rice as Vice-President was in charge of the Bond Department, and that at the various times named in the petition, the Trust Company, through its Bond Department placed orders for the purchase of the stock mentioned in the petition, which stocks were purchased by the defendant with the proceeds of the several checks mentioned in the petition.

It is alleged that the Trust Company directed the defendant to credit the proceeds of the checks to certain accounts which was done by the defendant, and that the securities purchased were delivered to the Trust Company.

It is alleged that each of said Treasurer's checks was signed on behalf of the Dayton Savings & Trust Company, by R. M. Griffiths, as Treasurer, and R. D. Deis, as Teller, both being its duly authorized officers to sign said checks; that the purchases made of stock were at the current market value.

As a third defense, it is alleged that if Franklin D. Rice did maintain and trade in said accounts for his own use and benefit that the Trust Company had knowledge thereof, on or before January 16, 1929, and that on said date it had in its possession, or under its control as the result of the transactions set out in the amended petition, securities of a value exceeding the amount claimed by the plaintiff to be due, and that if any loss occurred to the Trust Company, said loss was the result of the failure of the Trust Company to sell said securities.

For a fourth defense, it is alleged that the company was insured against pecuniary loss resulting from any act of dishonesty on the part of its officials, including said Rice, and that pursuant to said contract the insurer has fully paid the Trust Company

for all losses which the plaintiff had sustained as a result of the transactions, and that the defendant is not the real party in interest. (No evidence was submitted in support of this defense).

To this answer a reply is filed, in which it is denied that Franklin D. Rice was an officer of the Dayton Savings & Trust Company, in charge of the Bond Department, and denies that the purchases of said stock were made through the Bond Department, but alleges that the purchases were made by the defendant on the order of Rice individually, and that the defendant had knowledge of the facts when said purchases were made.

It is denied that the defendant had knowledge on January 16, 1929, that the transactions described were carried on by Rice for his own benefit, and says that the transactions as to said Bank were fraudulent, and that said Rice was using the funds of the Bank for purposes of which it had no knowledge, but of which the defendant had knowledge.

After the plaintiff had introduced its evidence, an oral motion was interposed by the defendant for an instructed verdict in its favor, on the grounds that there is a fatal variance between the pleadings and the proof; that there was no evidence on the material issues as framed by the pleadings, and no evidence of any loss to plaintiff on account of the allegations of the petition, and that the evidence introduced by the plaintiff in support of the allegations of the petition shows that as a matter of law the loss, if any, sustained by the plaintiff as a result of the transactions were occasioned by the fault of the plaintiff itself, and not attributable to any charge made in the petition.

Upon a consideration of the motion the court below sustained the same, and instructed that a verdict be returned in favor of defendant and after the usual motions a judgment was entered in favor of defendant, and the cause brought to this court for review, "On questions of law."

There are allegations that the court erred in excluding certain testimony.

We have examined the questions raised in reference to this alleged error of the court in excluding evidence, and are of the opinion that there was no error in the ruling of the court. It is not necessary to touch upon this matter further.

## THE ISSUES

The single issue is whether or not the court below erred in instructing the jury to

return a verdict in favor of defendant after introduction of the plaintiff's evidence.

The rule that must govern us in the consideration of this alleged error may be found in **Hamden Lodge v Gas Company, 127 Oh St 469**, where it is held:

"Upon motion to direct a verdict the party against whom the motion is made is entitled to have the evidence construed most strongly in his favor. But if upon any essential issue, after giving the evidence such favorable construction, reasonable minds can come to but one conclusion and that conclusion is adverse to such party, the judge should direct a verdict against him.

"Where from the evidence reasonable minds may reach different conclusions upon any question of fact, such question of fact is for the jury. The test is not whether the trial judge would set aside a verdict on the weight of the evidence."

And at page 482:

"* * the question whether the case must be submitted to the jury should not be tested by asking whether there is any evidence, however slight, tending to support each material issue; it should be tested by asking whether upon the evidence adduced reasonable persons might reasonably reach different conclusions. Before a verdict may be directed against a party the evidence must be given the most favorable interpretation in his favor. If, after such interpretation the court finds that upon any material issue only an adverse conclusion can reasonably be drawn, it should direct a verdict against him."

The rule is re-stated in the case of **Bevan v N. Y. Ch. & St. L. Rd., 132 Oh St 245:**
"Where upon all the evidence reasonable minds can come to but one conclusion, it is the duty of the court if requested to direct a verdict accordingly."

The court in that case quoted the Federal rule with approval:
"Where the evidence upon any issue is all on one side or so overwhelmingly on one side as to leave no room to doubt what the fact is, the court should give peremptory instructions to the jury."

See also **Insurance Co v Huff, 128 Oh St 469.**
It would be unfortunate if trial judges should so interpret these principles as to assume that if the judicial mind can come to but one conclusion other reasonable minds might not come to a different conclusion, or that the conclusion of the court upon a motion to direct a verdict, is the only one that reasonable minds might reach.

There is a definite place in our system of procedure for the exercise of the function of jurors, as triers of fact, and this should not be nullified by the assumption of the court that of the thirteen minds devoted to the question at issue only that of the judge is "reasonable."

Keeping these principles in mind we will examine the evidence in this case to ascertain whether or not the court erred in instructing a verdict in this case.

The evidence relates to many complicated bank and stock transactions, which might have a tendency to obscure the issues if not carefully analyzed.

### CLAIMS OF COUNSEL

The claims of counsel for the several parties may be briefly summarized.

It is claimed on behalf of appellant that Franklin D. Rice, Vice-President of the Trust Company, W. C. Powell, a customer of said company, and William C. Ford, manager of the Dayton office of the defendant, W. E. Hutton & Company, formed a pool to purchase stock, the details of which may not now be learned for the reason that Rice and Powell both committed suicide, and that Ford's interests were adverse to the appellant because of his association with the appellee; that Rice had an unauthorized account at the office of Hutton & Company, which was carried as Account No. 220, under the name of Dayton Savings & Trust Company, Attention Franklin D. Rice, and on the books at Cincinnati Account No. 559, under the name of Dayton Savings & Trust Company, c/o W. E. Hutton & Company, and an account in the name of his mother, Mary V. Rice.

It is asserted that these accounts were unauthorized for the reason that the purchase of stock could not lawfully be made by the Dayton Savings & Trust Company, in its own name, as being of stock that could not be purchased by a bank, and that Rice had no authority to buy or sell stock for customers of the bank, which duty devolved upon the Bond Department, supervised by another official of the bank and that under the rules of the Stock Exchange, such transactions were prohibited.

It is asserted that this and other accounts were used for the purchase of certain shares of stock, and the buying and selling of the same, which ultimately re-

584

sulted in a loss to the bank in the amount claimed, less the amount that may yet be secured from the stock held as collateral to secure the loans made by the bank.

It is admitted by appellee that inasmuch as the error claimed is that of directing a verdict, the benefit of every reasonable inference to be drawn from the evidence must be given to the appellant, but it is urged that conceding all that the appellant claims, yet there is no liability upon the part of the appellee, as such could only rest upon proof that it either had actual knowledge of the fraud, or that its employee, Ford, had knowledge thereof under such circumstances that his knowledge must be imputed to the appellee.

It is asserted that the case of **First National Bank v Burns et, 88 Oh St 434**, relied upon by the appellant, is not applicable to the facts in this case, and that the knowledge Ford may have had of the fraudulent purposes of Rice could not be imputed to the apellee, for the reason that the transactions in which Ford may have been involved were adverse to the interest of his employer, and not within the scope of their business, nor within the scope of Ford's authority.

The appellant has sought to clarify the theory upon which it seeks a recovery by the following statements on pages 6 and 7 of its reply brief:

"It is not the use of the proceeds of the loans complained of in this cause; it is the unauthorized use of the money arising from the sale of the original collateral."

"The principle upon which the appellee's liability is grounded is: 'A person, who without being privileged to do so, intentionally causes or assists an agent to violate a duty to his principal is subject to liability to the principal'."

"In this case the plaintiff is complaining of the wrongful act of the defendant's agent. That wrongful act was the acceptance by Ford of treasury checks to discharge what he knew were the private obigations of Rice."

The court has carefully studied the record in this case and examined the voluminous exhibits, and is free to say that the case is difficult to analyze or clearly present, as it is an action based upon unusual conditions. The exhibits are largely technical. There has been an attempt to analyze them by expert witnesses, as well as those familiar with the facts, but there are still technical matters which the court may not fully comprehend.

### BASIS OF RECOVERY

While it is not clearly stated in the petition, the plaintiff, as a matter of fact seems to base its right to recover upon the unauthorized use of money arising from the sale of the collaterals which were originally deposited with three notes; one, plaintiff's Exhibit 8 for $54,000.00, signed by William C. Ford and dated February 16, 1928, one for $40,000.00, signed by William C. Ford, dated June 4, 1928, and one for $91,500.00, signed by William C. Ford, and dated January 16, 1929. The first and last of said notes still remain unpaid in their original amounts, but upon the $40,000.00 note there appears a credit which leaves a balance due on that note of $35,966.00; leaving total unpaid balance of said three notes $181,466.00, which amount is identical with the payment claimed to have been made by the plaintiff to the defendant by the seven several treasurer's checks set up in the petition.

The records disclose the fact that there were quite a number of other treasurer's checks given by the plaintiff to the defendant. All these checks were made payable to W. E. Hutton & Company. It may be a coincidence that the total of the seven checks amounts to the total due on the three notes, or it may be that the plaintiff has been able to select a certain grouping of checks that equals the amount of the notes.

In counsel's letter of November 28, 1930, Exhibit 46, addressed to the defendant, he advises the defendant that the Trust Company holds certain collateral, to-wit:

1,000 shares Continental Baking Corporation, Class B Stock;
3,000 shares Willys-Overland, Common Stock;
2,500 shares Congoleum-Nairn, Inc., Common Stock;

which it tenders back upon the payment of the notes of William C. Ford.

A letter addressed, under date of July 11, 1930, to William C. Ford, demands the payment of the notes in the aggregate of $181,-466.00 and recites the securities held.

At a subsequent date, February 1, 1937, the 2500 shares of Congoleum-Nairn was sold for $76,499, to which amount, of course, the defendant would be entitled to credit.

While the plaintiff bases its cause of action upon the money advanced by the seven several treasury checks, as modified

by the statement in counsel's brief that the action is not based upon the loans made to Ford, but upon the unauthorized use of the money arising from the sale of the original collateral. yet the whole transaction and the cause of action asserted are intimately related to the Ford notes and it is on account of the actions of Ford and his position as the Dayton Superintendent of the defendant, W. E. Hutton & Company, a partnership, that it is sought to recover the loss from Hutton, which is a co-partnership with offices in various cities in the United States.

The name of W. C. Powell is brought into the picture through the fact that some $16,000.00 derived from the sale of securities were applied to the account Powell had with Hutton & Company.

When William C. Ford executed the note of February 16, 1928, for $54,000.00, there were deposited with it certain securities, to-wit:

500 shares Chrysler Corporation, Interim Stock;
500 Shares National Cash Register, Class A. Interim;
100 shares National Cash Register, Class B. Stock.

The loan card indicates that the 500 Chrysler stock, the 500 N. C. R. Class A and the 150 N. C. R. Class B were surrendered on September 15th, 1928, to W. C. Ford, as indicated by his receipt, and that as security for the note, 2,500 shares of Congoleum-Nairn were substituted.

On the $40,000.00 note, dated June 1, 1928, there were originally deposited as collateral 500 shares of Chrysler, held by the National Park Bank, which security was surrendered to Ford on June 15th, 1928. Changes were made in the security attached to this note so that at various times the note was secured by 1.000 shares of Superior Oil Company Corp., 1,000 shares of Omnibus Corp., 2,000 shares of Omnibus Corp., 400 shares of Accoustic Products Co., all of which at various times were surrendered to Ford, as follows:

June 15, 1928, 500 shares Chrysler Corp.;
March 16, 1928, 400 shares Accoustic Products Co.;
May 14, 1929, 1,000 shares Omnibus Corp.;
September 13, 1929, 1,000 shares Superior Oil Co.;
October 8, 1929, 1,000 shares Omnibus Corp.

When the shifting of securities terminated, there was left on this note 1,000 shares Continental Baking Corp. Class B.

The note for $91,500.00, dated January 16, 1929, was secured by a deposit of 3,000 shares Willys-Overland Co., quoted on the loan card as worth thirty-three, a total valuation of $99,000.00. A further notation appears on that card, "$20,000.00 equity in other loan, consolidation of two loans, paid $10,000.00."

Throughout the testimony in this case these three Ford notes are spoken of as having been "discovered" among the assets of the bank, which were being appraised, in contemplation of the consolidation with the Union Trust Company. The notes, however, show on their face that they were all initialed by the Credit Committee of the Bank, presumably at the time the notes were given. It could probably be assumed that in addition to this Credit Committee, made up of one half of the Directors of the Bank, all notes were submitted monthly to the Board of Directors. All the payments made by treasurer's checks to W E. Hutton presumably issued upon the credit obtained by Ford by the giving of these notes were signed by the treasurer and teller of the Trust Company. In a number of transactions securities were sold which resulted in distribution to the Bank of certain sums of money which were credited on these Ford notes as payment of interest, and interim receipts were given to Ford on at least two occasions, one covering the National Cash Register Co. stock and the other the Chrysler Corp., both of which were signed by G. H. Casselberry, Vice-President.

In addition, certain sums connected with these three notes and the securities deposited by them were evidenced by certificates of deposit of the Dayton Savings & Trust Co. made payable to the Dayton Savings & Trust Co. and marked "Paid" without other endorsement, on various dates. These certificates were signed by R. M. Griffith, a treasurer.

The court has had difficulty to correctly appraise the purpose of the issuing of these certificates of deposit. At least fourteen were issued between May 17, 1928 and June 10, 1929, in an aggregate sum of $494,700.19. This was not the actual sum deposited. as many of the certificates were the reissue in lesser sums of original certificates for larger sums.

What was done with these certificates between the time of their issue and the time of payment does not clearly appear. They

should have been attached to the note from which the security was taken, but the loan card does not so indicate. There was no doubt a security ledger which would show just how the several certificates were treated. If they were attached to a note, then the security for that note was larger by the amount of the certificate than shown by the loan card. If they were not, then the security for the note was depleted to that extent, at least. We feel that the plaintiff should have produced the security ledger.

Whatever may be the fact in this case as to these matters, it is perfectly plain that it can not be successfully denied that the existence of the Ford loans and the manipulation of the securities were known or should have been known to the Bank officials. It is asserted by plaintiff that these matters were so handled, with the connivance of the defendant through their agent, Ford, that the Bank was in ignorance and as a consequence suffered a loss by depletion of its securities. It appears to us that the Bank did know of these transactions, but was remiss in not properly safeguarding the securities deposited as collateral to the loans and in not requiring payments on the notes when money was available, instead of returning such money to the makers of the notes through the device of certificates of deposit.

There were five Ford loans, two of which were merged into the last loan of $91,500.00.

The deposition of William R. Craven, former President and Chairman of the Board of the Dayton Savings & Trust Company, (record 187) will throw light upon the Bank's carelessness in the handling of its assets.

During these times there was an active rising market.

National Cash Register, A, a stock originally deposited with the Ford note was on January 3, 1928, sold on the market at 49½ and a year later, January 1st, 1929, it sold for 99 and on January 24th at 119; Chrysler, on February 7th, 1928, sold at 58, and June 4, at 83; Combustion Engine from August to December increased from 61 to 76; and Graham Paige from January, 1928, to May, from 20 to 34. Neither Willys-Overland nor Congoleum had such a satisfactory advance and Continental Baking B dropped in value from 19½ to 12.

## ACCOUNTS CARRIED IN THE NAME OF THE BANK

It is claimed by plaintiff that the accounts in the name of the Bank, through which Rice conducted his operations, show-

ed upon their face that they were transactions in which the Bank could not engage and that therefore Hutton & Co., knowing through its agent, Ford, that Rice was conducting such operations, should have been on guard and refused the account, and not having done so, is responsible for the loss. In answer to this it is sufficient to cite Block et v Pa. Exchange Bank, 170 NE 900 (253 N. Y. 227) opinion by Cardoza, then Chief Justice of New York and now on the United States Supreme Bench, in which it is held:

"Purchase by commercial bank of shares of stock on its own order, acting as agent for undisclosed third party, held not ultra vires of bank. Court may take judicial notice of established banking practice to purchase securities for benefit of customers."

## SOME OF THE ACCOUNTS PRE-DATED THE FORD NOTES

Another matter that may be noted in this connection, is that some of the accounts now complained of as being unauthorized, had existed with Hutton & Company for many years prior to the entrance of Ford upon the scene, through the instrumentality of his notes.

Account 559, Dayton Savings & Trust Co., dated at least back to December, 1926, and seems to have covered many transactions other than those under the Ford loans. The Mary V. Rice account began as early as 1925, and during 1927 and 1928 was very active. On January 17, 1929, the day after the execution of the $91,500.00 Ford note, it was credited with cash, $98,-325.00. A large purchase of National Cash Register and City Service brought the balance due on this account on January 31, 1929, to $128,880.00. On May 8, 1929, the Mary V. Rice account was balanced through the sale of various stocks. The stocks dealt in on this account during '28 and '29 were largely such as at various times appeared as security on the Ford notes.

Account 220, Dayton Savings & Trust Co., Attention Franklin D. Rice, was opened October 27, 1927, and closed, balanced, October 8, 1929. It discloses large purchases of stocks, many of which appear on the Ford notes, and also shows many cash payments in large amounts, designated "bank" and "check." One credit was "bank wire" $61,222.00. There can be no doubt that Rice used these accounts largely for his own speculations, buying and selling under these names.

## WHAT THE PLAINTIFF MUST PROVE

Before the plaintiff can prevail in this action, the evidence, considered most favorably, in its behalf, should show, first, that Hutton received funds of the Dayton Savings & Trust Company; second, that the moneys were received under such circumstances that a duty arose upon the part of Hutton to refund to the Trust Company; third, that Hutton & Co. did not refund and that Ford had guilty knowledge of the purpose of Rice and that such knowledge was attributable to his principal, Hutton.

It seems to the court that there are a number of obstacles which the plaintiff has failed to surmount.

It is claimed that the money paid to Hutton was the money of the bank. It was paid to W. E. Hutton & Co. by treasury checks signed by R. M. Griffiths, Treasurer, and R. W. Deis, Teller. But the source of the credit upon which the checks were drawn were the notes of Ford which had been regularly passed upon by the loan committee. The money represented by the checks was no longer the bank's money, but the money of Ford. The bank held his obligations to pay, secured by proper collaterals, and Ford could do what he chose with the proceeds of his notes. That he permitted the bank, through the instrumentality of Rice, to invest in securities bought through Hutton, was no concern of the bank. It was his money and not the bank's that was paid to Hutton & Co. by the checks in question.

The facts seem to be that the Bank, carelessly conducted and improperly supervised, loaned its money on insufficient securities; that its Credit Committee authorized loans to irresponsible parties and that its officials were not as alert as they should have been to see that the securities originally deposited as collateral on the notes were preserved intact, or that if they were not so preserved, that those substituted were of sufficient sound value to secure the loan. The bank is estopped from asserting that losses which occurred on account of its own negligence should now be shifted to Hutton & Co. because it was the agent through which stocks were bought and sold.

Over a course of years Hutton & Co. had done business with the Bank in buying and selling securities for the customers of the Bank whose names were undisclosed to Hutton & Co., and this was a custom sanctioned by brokerage useage. Hutton & Co. was not put on its guard by the mere fact that an account was carried either in the name of the bank or in the name of individuals, through which accounts Rice carried on transactions, which ultimately resulted in a loss.

In the transactions involving the five notes of W. C. Ford, three of which were ultimately unpaid, the Bank was in full possession of sufficient facts to have put itself on guard, not only against Ford, but against the operation of Rice, through the instrumentality of Ford.

## COULD THE KNOWLEDGE OF FORD BE IMPUTED TO HUTTON & CO?

Admitting, for the purpose of argument, that Ford had entered into a conspiracy with Rice to defraud the bank and had full knowledge of that purpose, it can not be said that that knowledge upon the part of Ford, the agent of Hutton, rendered Hutton & Company responsible for the loss which occurred.

The principles expounded in **First National Bank v Burns, 88 Oh St 434,** do not justify the claim made by the plaintiff that knowledge gained by Ford outside the scope of his authority as agent of Hutton & Co. and in pursuance of activities not within his employment, is binding upon Hutton & Company.

The principle invoked by the plaintiff, under which he seeks to hold Hutton & Company, as discussed in Bank v Burns, supra, much more nearly appraise the relationship of Rice to the bank. He was an officer of the bank, in active control of much of its machinery and in constant touch with other officers, and notice to him was notice to the bank in transactions conducted by him within the scope of his authority, which was that of a vice-president, and whatever knowledge he had in any capacity, whether as individual, director or officer, he carried with him in the performance of any function within the scope of his general authority. He owed the bank a duty in every transaction in which the bank took part which was under his observation and whatever notice of facts he had in any capacity which was material in the performance by him in any bank transaction, became notice to the bank. Notice to him of facts was notice to the bank, if such notice came to him in the performance of his duty to the bank.

It may be true that notice of any fact that came to him while he was acting beyond the scope of his authority and against

the interest of the bank could not be imputed to the bank, but he still had notice of many matters well within the limits of his authority, concerning which it was his duty to give notice to the bank officials. The bank officials necessarily had notice of these transactions, sufficient to put the bank on guard, even though Rice made no disclosures to it.

If loss to the bank occurred on account of Rice's failure to give notice to the bank officials of those matters, knowledge of which came to his attention while acting within the scope of his authority, that loss must be borne by the bank and not shifted to Hutton & Company on the alleged irregularities of Ford which were more remotely connected with the loss, and which could have had no effect but for the greater delinquencies of Rice.

### DUTY OF BANK AS TO THE SECURITIES

The third defense of the answer alleges that if Rice did trade in the accounts for his own benefit, the Trust Company had knowledge thereof on or before January 16, 1929 (the date of the last Ford note) and that on said date it had securities exceeding the amount claimed and that if loss occurred it resulted from the failure of the Trust Company to sell. The last note was for $91,000.00, and the listed securities were 3000 shares Willys-Overland at 33, and in addition $20,000.00 equity in other loans. This would make the security for the $91,000.00, $119,000.00.

The letter of November 28, 1930, lists as collateral held for the three notes on the claim of $181,466.50:

1000 Continental Bakery B.
3000 Willys-Overland
2500 Congoleum-Nairn

The 1000 Continental Baking B and the 2500 Congoleum-Nairn were probably attached to the other notes merged into the last loan. There is no evidence as to the value of Continental Baking in January 1929, but shares of this stock were quoted Sept. 13, 1929, at 12¾ or a total for 1000 shares $12,875.00. On January 10, 1929, the quoted value of Willys-Overland was 33½ or $100,500.00 for 3000 shares. Congoleum-Nairn was quoted January 24, 1929. at 32—or $80,000.00 for the 2500 shares.

The total security was $193,375.00 in value as against a debt of $181,466.50 on these three Ford notes which had about them a distinct flavor of insecurity, known

of course to Rice and certainly within the knowledge of any careful banker.

In January, 1929, one note was a year old, with no credits and one six months with a small credit. We see no reason why the bank could not have forced payment sometime before the crash came on October 13, 1929. There was plenty of opportunity with an active market. The bank failed to act. We see no reason why it should ask Hutton & Company to bear the loss resulting from its own negligence. There is some statement that these notes were not "discovered" until a consolidation was sought. They all had the initialed "O.K." of half of the board of directors and if their existence was not known it was the fault of the bank and it must bear the loss and not Hutton & Co. who had no connection with the notes, save that they were notes of their Dayton agent.

This has been a difficult case for trial and review. Counsel have been diligent, not only in their briefs, but in their oral argument to the court below, in presenting the case in a masterly manner.

We find ourselves in full accord with the conclusion of the court below and are of the opinion that the court did not err in directing a verdict at the conclusion of plaintiff's testimony.

Entry accordingly.

BARNES, PJ, concurs.
HORNBECK, J, concurs in judgment.