EDWARD W. CLUCAS ET AL., TRADING AS E. W. CLUCAS & COMPANY, PLAINTIFFS-RESPONDENTS, v. BANK OF MONTCLAIR, DEFENDANT-APPELLANT.

Argued February 19, 1933—Decided April 28, 1933.

For the defendant-appellant, *Ward J. Herbert* and *Robert H. McCarter*.

For the plaintiffs-respondents, *Scammell, Knight & Reese* (*Lyle Evans Mahan* and *Scott Scammell*.)

The opinion of the court was delivered by

BODINE, J. The plaintiff succeeded to the rights of a prior existing firm of stock brokers trading under the same name. The complaint alleges the purchase by the old firm, at the defendant's request, of one thousand shares of Crocker-Wheeler Electric Manufacturing Company "when issued stock." It also alleges the refusal by the defendant to take delivery thereof when tendered. Damages were sought for the differences between the price paid and the price received when the stock was sold after notice at the defendant's risk. Included therein were commissions earned and taxes paid upon the purchase and resale. The defendant left the plaintiffs to their proofs but offered two special defenses: (1) That the transaction was *ultra vires;* (2) it was illegal within the meaning of the "act to prevent gaming."

The former firm of E. W. Clucas & Company employed Horace I. Poole as salesman. His duties were to stimulate business. While canvassing the banks of North Jersey, he met James S. Hume, assistant vice-president of the Bank of Montclair, among whose duties were meeting bond salesmen. Sometimes he made purchases and reported to the senior officer; other times he consulted the president before placing commitments. Poole was assiduous in his calls and Hume was an attentive listener. Finally, the plaintiff secured, through Poole, orders from Hume and confirmations were sent to the Bank of Montclair and the usual correspondence ensued between the brokers and the bank. In some instances stocks purchased on order by Hume were sold on his order and the proceeds remitted to the bank. In at least one instance stocks purchased on Hume's order were paid for by the bank. During July, August, September and October, orders were given for a number of purchases and sales of stock. Transactions between the parties occurred nearly every week and were handled in the same manner. The bank also maintained a private wire to another New York brokerage house.

The market price of Crocker-Wheeler Electric Manufacturing Company was very high, when the orders were given.

The board of directors had called a meeting of the stockholders to vote on a proposition to issue ten new shares of stock for each old share. The vote was to be taken October 10th, 1929. After the meeting was called, the stock was traded in on the New York Curb Exchange on a when issued basis. The rules of the exchange contemplate dealings in "when issued stock." The orders for the stock, giving rise to the present action, were placed by Hume, purporting to act for the Bank of Montclair. The receipts for the contracts covering the purchases were acknowledged as follows: "Bank of Montclair, Montclair, N. J., J. S. Hume, Asst. Vice-Pres."

The trial court held as a matter of law that the transactions were not beyond the defendant's corporate powers, and that they were not illegal. The jury must have found that the brokers, and their agent Poole, dealt with Hume in good faith and in reliance upon his apparent authority, evidenced by the acts of the bank. Our examination of the record leads us to the conclusion that the issues of fact required the submission of the case to the jury.

The Bank of Montclair was organized under "An act to authorize and regulate the business of banking." Revision approved April 9th, 1875; Revision of New Jersey, 1877, page 58. The Revision of 1899 (*Pamph. L., p.* 431), somewhat enlarged the banking powers of existing banks, but by *Pamph. L.* 1927, *p.* 37, a supplement to the act of 1899, banks were authorized to purchase, invest in and sell stocks of corporations. It is argued that the Revision of 1899 and the supplement of 1927 are inapplicable to the Bank of Montclair. We think not. Section 36 of the Revision of 1899, page 449, is in part as follows: "The powers and privileges conferred and imposed upon any bank, banking company or domestic corporation authorized to do a banking business, other than a trust company or a savings bank, existing and doing business under the laws of this state, are hereby abridged, enlarged or modified, as each particular case may require, to conform to the provision of this act and to such amendments as may be made hereto." This language indicates to us a legislative purpose to enlarge the banking powers of banks organized

under prior acts in order to conform with a new and general act and changes thereafter to be made therein. We cannot attribute to the legislature an intention to enlarge the powers by amendment to the act but not by supplement thereto.

"When issued stock" is not a subscription to stock to be issued. It is treated on the exchanges as an existing property. However, written contracts are required in addition to the usual exchange of tickets. *Meyer, The Law of Stockbrokers,* 189. "When issued stock" is not an elusive but a definite thing. The bank by its purchase became obligated to pay for a definite number of shares of stock, provided the corporation completed the step necessary to issue ten new shares for each old share then in existence. All that would be accomplished by the change in corporate set up would be an increase in the number of shares by multiplication.

Upon receipt of the bank's orders, the brokers made contracts for the purchase of the "when issued stock" which bound them to make payment for the same when issued. The defendant bank received due notification thereof. So far as the parties were concerned, there was a definite dealing with property as though in existence in accordance with recognized rules. We cannot regard such a purchase as a subscription to something not then in existence, but rather as an agreement to buy a definite stock interest in an existing corporation, provided the directors decided to issue ten new shares for each old share. If the contract was contingent that the directors print stock certificates on red paper rather than white, it could not be said that it was a subscription and not a contract for the purchase of stock. A corporation authorized to buy stock can certainly enter into a valid contract for the purchase thereof.

The evidence adduced does not indicate that the purchase of the stock in question was for the purpose of bank speculation. "Invest" means, according to Webster's Collegiate Dictionary, "to lay out (money or capital) in business with the view of obtaining an income or profit; as to invest money in bank stock." "Speculate"—"to buy or sell with the expectation of profiting by a rise or fall in price; often to engage

in hazardous business transactions for the chance of unusually large profit." There is nothing to indicate that there was anything more hazardous or profitable in the stock of an electrical manufacturing business than in any other well conducted manufacturing enterprise. Even the investor expects a profit and not a loss. The parable of the talents would seem to be authority for the proposition that there is more merit in the wise use of money left with a banker than in tying it up in a napkin and burying it in the ground. The bank could not only buy stock for investment, but it could also buy stock for the account of its customers. Even if we regard the purchase of the stock in question as a speculation there is nothing to prevent a bank's customers from speculating for future profit. And since it would not be beyond the powers of the bank to make a purchase in a speculative stock at the instance and request of its customers, the mere purchase would not indicate to a broker that the bank was speculating. The bank could act as an undisclosed principal for a customer who gave it adequate security, even though the customer was speculating. The mere purchase of a speculative stock is not evidence that the purchase was *ultra vires*. *Block* v. *Pennsylvania Exchange,* 253 *N. Y.* 227.

Of course, there is testimony, not denied, that there was no intention to accept delivery of the stock, but that Hume, in behalf of the bank, had indicated an intention to sell the stock before the delivery date. This standing alone indicates no more than a short term commitment—a usual banking use of balances. Thus are short term governmental, industrial and individual loans made—frequently at a profit; sometimes at a loss. It is obvious to all that shares of common stock are a more hazardous investment than fixed obligations of responsible corporations or individuals. But the legislature authorized such investments. We cannot view the length of time a given position is intended to be held as evidencing speculation.

It is suggested that, since the bank was not required to pay in whole or in part upon the making of the contract and its agent expected that the stock would be sold before delivery, the transaction was a dealing in differences and an offense

against the gaming statutes of this state. Not so. "The purchase or sale of stock is not rendered invalid by the fact that the party making it does not expect ever to make payment or delivery, but intends to close out the transaction before payment or delivery is called for. Nor is it rendered invalid by the fact that it is in fact so closed out. * * * It is entirely proper for purchases and sales to be made with the intention of closing them out without payment and delivery, so long as both the original purchases or sales, and the sales or purchases which close them out, are actual *bona fide* transactions, each contemplating payment and delivery. The fact that the other party knows of the intention to close out a transaction, before its consummation, by a reverse transaction, is immaterial. It is still a valid *bona fide* contract, enforceable as such, and not a mere agreement to gamble on differences in market prices." *Meyer, Stockbrokers and Exchanges* 222.

"A sale for future delivery is not on its face void, but is a perfectly legal and valid contract, it must be shown by him who attacks it that it was not intended to deliver the article sold, and that nothing but the difference between the contract and the market price was to be paid by the parties to the contract. And the fact that at the time of making a contract for future delivery the party binding himself to sell has not the goods in his possession and has no means of obtaining them for delivery, otherwise than by purchasing them after the contract is made, does not invalidate the contract. * * * In order to invalidate a contract as a wagering one, both parties must intend that instead of the delivery of the article there shall be a mere payment of the difference between the contract and the market price. * * * 'Agreements for the future delivery of grain or any other commodity, are not prohibited by the common law * * * nor by any policy adopted for the protection of the public. What the law does prohibit, and what is deemed detrimental to the general welfare, is speculating in differences in market values.' * * * A contract which is on its face one of sale with a provision for future delivery, being valid, the burden of proving that

it is invalid, as being a mere cover for the settlement of 'differences' rests with the party making the assertion." *Clews* v. *Jamieson,* 182 *U. S.* 489, 490.

"In other words, contracts for future delivery made with the intention of settling them by paying to the other parties to the contracts the difference between the contract prices and the market prices at the times of delivery are wagers and are void. But contracts for future delivery made with the intention of settling them by set-off or by ringing off and by the payment of differences in accordance with the rules and practice of the board of trade are valid and enforceable agreements under this decision. * * * An intention by one or both of the parties to sell such an agreement, or their rights under it, before the time of delivery, does not avoid it. Parties have the same right to buy contracts for the future delivery of personal property with the intention of selling them that they have to buy the property with such intention." *Cleage* v. *Laidley,* 149 *Fed. Rep.* 346, 352.

"On the other hand, there are lawful customary and generally prevailing methods of closing out such contracts, settling them and discharging the obligations of the parties thereunder which do not render such contracts wagering contracts or illegal, to wit: (1) by sales; (2) by direct set-offs, and (3) by ringing off before the times of delivery specified in the contracts arrive, so that when those times come no liability to deliver or to pay will exist, and *if the parties when they make such a contract intend not to deliver or to pay for the commodity at the time fixed in the contract therefor because they intend to close out the contract and to settle their obligations thereunder by the use of these lawful methods before the time fixed for the delivery arrives, that intention not to pay or deliver is consistent with the laws and the public policy regarding wagers* and it does not make or tend to prove such a contract a wagering contract, illegal or void." *Gettys* v. *Newburger,* 272 *Fed. Rep.* 218; *certiorari* denied, 257 *U. S.* 649; appeal dismissed, 260 *U. S.* 693.

"As already stated, there was no delivery on any of these contracts, but before delivery dates were due they were all

closed out by the lawful, customary and generally prevailing methods permitted by the rules and regulations of the exchange and its clearing house, and Bryant's intention when he made his contracts that they should be closed out in that way did not render them wagering contracts." *Mullinix* v. *Hubbard, 6 Fed. Rep. (2d)* 109, 114.

Hume testified, "it was never the intention of holding the purchase beyond the deliverable date. Therefore, I would never have to pay any money for them." This was not denied. The proofs may be capable of the inference that the brokers, through their agents, knew his intentions. The bank having perhaps the power to buy stock for itself, certainly had the power to buy for an undisclosed principal and could indicate an intention to sell the same at any time even before delivery. But when, as here, there was a real dealing between the bank and the brokers, in accordance with the rules of the exchange, the mere circumstance that the bank might intend to sell before delivery no more tainted the transaction with illegality than if an individual had given an order to buy, and had then said, "I intend to give you an order to sell to-day, to-morrow or the next day." In fact, that is often the way orders are given. The bank would have the same power to sell as to buy and the mere fact that it intended to sell the stock does not show an intention to settle on differences between the market prices. In the present case, actual contracts were made. The bank's troubles arose because its agent Hume failed to carry out his intentions to sell before the market fell. The proofs do not, when taken most strongly in favor of the bank, indicate a wagering as defined in *Flagg* v. *Baldwin, 38 N. J. Eq.* 219, 227; *Pratt* v. *Boody, 55 Id.* 175; *Minzesheimer* v. *Doolittle, 60 Id.* 394; *Sharp* v. *Stalker, 63 Id.* 596; *Thompson* v. *Williamson, 67 Id.* 212; *Blessing* v. *Smith, 74 Id.* 593. It would, therefore, have been error to have left to the jury the question of whether the contracts were invalid under the gaming laws. The evidence goes no further than that it was the buyer's intention to make a sale of the stock before the time fixed for delivery. Such intention does not evidence an express agreement to settle on differences by reason of a

mutual understanding or agreement that no deliveries were to be made, or that the parties intended to rely solely on the rise and fall in the quoted prices of stocks as the entire measure of their rights. At most, there was a mere understanding by one of the parties to the contract that the stocks would be carried on the bank's credit until an order for sale should be given or the time came for delivery. The intention of the bank, even if the brokers knew thereof, did not make a contract that the differences only should be settled, or deprive the brokers of the right to make deliveries as and when fixed by their contracts. *Thompson* v. *Williamson, 67 Id. 212, 221.*

It was not error for the trial judge to refuse to charge the seventh request, as follows: "The bank was not authorized by law to purchase stock except for investment purpose and this does not include a right to speculate in stock. If the jury believe that the purpose underlying this transaction was speculative there can be no recovery." Even though the transaction may be regarded as one of speculation, there is nothing in the case to indicate that the bank was speculating. The power of a bank to buy stock, not only for itself but for its customers is well recognized. The mere proof of a purchase of a speculative stock does not indicate that the bank was speculating on its own account, but every presumption would be in favor of the legality of the transaction.

Hume's testimony that he was to have a free ride demonstrates nothing, in view of all the evidence, except his hope that the stock his employer appeared to be buying would prove profitable to him. The burden was upon the defendant to show that the transaction was one forbidden by the gaming statutes, and the hopes of Hume and his intentions to sell are not evidence that the transactions were not *bona fide*. One who buys may always sell and those who buy usually expect to sell at a profit.

Among the dealings between the parties was a commitment in Baldwin Locomotive in August, for which the bank paid upon delivery in September. The payment was after the stock in suit was ordered. The transaction had its inception prior to the dealings which the brokers sought to show they were

justified in believing were authorized. There can be no doubt that the brokers could show the usual course of business upon which they relied, and the payment for stock previously ordered was cogent evidence of Hume's apparent authority. The mere circumtsance that the payment was subsequent to the transaction in suit made the prior order no less evidential, the proof of payment for such prior order was evidence of the completion of a prior transaction.

"There are cases in which the powers of an officer of a corporation and his authority to act for the company are enlarged beyond those powers which are inherent in his office. But those are cases in which the agency of the officer has arisen from the assent of the directors, presumed from their consent and acquiescence in permitting the officer to assume the direction and control of the business of the company. Thus, when, in the usual course of the business of a corporation, an officer has been allowed to manage its affairs, his authority to represent the corporation may be implied from the manner in which he has been permitted by the directors to transact its business." *Fifth Ward Savings Bank* v. *First National Bank*, 48 *N. J. L.* 513, 527.

"Normally, an agency arises from some contract or other transaction or transactions that are between the principal and the agent, and not ordinarily known to outside parties, and a third party is entitled to hold the principal on a contract made by the agent in the name of the principal, even though the party does not at the time of the making of the contract know the particular source of the agent's authority. In cases of the class now before us, the third party, when litigation necessitates proof of the agency, may adduce evidence of the customary exercise by the alleged agent of the authority appropriate to such an agent under circumstances that give rise to the inference of knowledge and acquiescence on the part of the principal—not necessarily to show that the principal is estopped in favor of the third party to deny the agency, but rather to show that such agency was in fact created." *Murphy* v. *W. H. & F. W. Cane, Inc.,* 82 *N. J. L.* 557, 563.

The charge in the present case, when examined as a whole,

seems to have been a proper presentation of the issues involved, and certainly the defendant was not prejudiced thereby. The requests to charge, in so far as proper, seem to have been substantially given. Nor do we find any error in the inclusion in the judgment of commissions earned in the Crocker-Wheeler transactions instigated upon the defendant's order.

The trial court properly, in the exercise of a sound discretion, confined the cross-examination of a witness called by the plaintiff to the subject-matter of direct testimony. This ruling did not preclude the defendant, when calling the same witness, from pressing any relevant inquiry. Suffice it to say that since defendant's counsel did not press the inquiry he desired, when he had the opportunity, he cannot assign error because he did not do so.

It is further contended that the trial judge erred in excluding testimony as to knowledge by the brokers of dealings carried on by Poole and the officers of another bank tending to show that the officers of the other bank were speculating in its name without authority. Similar and identical acts are sometimes receivable in evidence to show knowledge, intent or design in an issue of fraud. *Crosby* v. *Wells,* 73 *N. J. L.* 790, 808. Granted that Poole may have on another occasion deceived his employers and sought to use another bank to cover the transactions of its employes, it does not indicate that his employers had knowledge that the present transaction was not *bona fide.* Because the officers of one bank may have been guilty of improprieties is no indication that officers of another bank have also been guilty. That an employe may have been misled by one set of men is no indication that he has been misled by others. And the circumstance that brokers may have had trouble with the account of one customer is no indication that they have knowledge of difficulties with the accounts of other customers.

All other matters suggested in the appellant's argument and brief have been carefully considered, but seems to us to require no further discussion.

The judgment is affirmed.

*For affirmance*—The Chancellor, Chief Justice, Trenchard, Parker, Case, Bodine, Donges, Heher, Van Buskirk, Kays, Hetfield, Dear, Wells, JJ.   13.

*For reversal*—None.