**ANADARKO PETROLEUM CORPORATION, a Delaware corporation, and Pan Eastern Exploration Company, a Delaware corporation, Plaintiffs,**

**v.**

**PANHANDLE EASTERN CORPORATION, a Delaware corporation, Panhandle Eastern Pipe Line Company, a Delaware corporation, Trunkline Gas Company, a Delaware corporation, Anadarko Production Company, a Delaware Corporation, R.L. O'Shields, R.D. Hunsucker, and R.C. Dixon, Defendants.**

Civ. A. No. 8738.

Court of Chancery of Delaware, New Castle County.

Submitted: Jan. 9, 1987.
Decided: Jan. 19, 1987.

William Prickett, Vernon R. Proctor, Wayne J. Carey, and Glenn A. Fugate, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Blake Tartt, of Fulbright & Jaworski, Houston, Tex., for plaintiffs; Dan A. Spencer, Houston, Tex., of Anadarko Petroleum Corp., of counsel.

Lawrence A. Hamermesh, and Leone L. Ciporin, of Morris, Nichols, Arsht & Tunnell, Wilmington, David B. Tulchin, Hyman L. Schaffer, and Norman Feit, of Sullivan & Cromwell, New York City, and Frank Douglass, and Charles G. King, of Scott, Douglass & Luton, Houston, Tex., for defendants.

OPINION

BERGER, Vice Chancellor.

This action involves a dispute between an oil and gas production company and its former parent, an interstate gas pipeline company. Plaintiffs are Anadarko Petroleum Corporation ("Anadarko") and its wholly-owned subsidiary, Pan Eastern Exploration Company ("Exploration"). Defendants are Panhandle Eastern Corporation ("Panhandle"), three of its subsidiaries, Panhandle Eastern Pipeline Company ("Pipeline"), Trunkline Gas Company ("Trunkline") and Anadarko Production Company ("Production"), and three former directors of Anadarko who were also officers and directors of Panhandle and/or its subsidiaries, Messrs. Hunsucker, Dixon and O'Shields.[1]

The lawsuit arises from the spin-off of Anadarko in the early fall of 1986. Anadarko complains that, immediately prior to the distribution of Anadarko's stock in the spin-off, Panhandle caused Anadarko to enter into various agreements which were unfair to Anadarko. Following the spin-off, the new board of directors of Anadarko unanimously voted to rescind the disputed agreements and, in response, Panhandle substantially reduced its takes of gas from Anadarko beginning early in December, 1986. Anadarko was unsuccessful in its efforts to temporarily restrain the gas purchase cut back, *see Anadarko Pe-*

1. For convenience and clarity, the parties will be referred to as Anadarko and Panhandle without distinguishing among their subsidiaries ex- cept where necessary to an understanding of the relevant facts and legal issues.

*troleum Corporation, et al. v. Panhandle Eastern Corporation, et al.,* Del.Ch., Civil Action No. 8738, Berger, V.C. (December 10, 1986) [Available on WESTLAW, DE–CS database], and now seeks a preliminary injunction to the same effect on a significantly expanded record.

### I.

The relevant facts may be briefly stated as follows. Panhandle, through its subsidiaries, Pipeline and Trunkline, is in the business of purchasing and transporting natural gas. In addition, through Production, Panhandle was engaged in the exploration for and production of natural gas since at least 1959. In 1985, Production's assets were "dropped down" to Anadarko, a newly created wholly-owned subsidiary.

Beginning in about 1983, the board of directors of Panhandle became concerned that the value of its gas production subsidiaries was not being fully recognized in the market price for Panhandle stock. As a result, a spin-off of Production (later, Anadarko) was considered, among other alternatives designed to enhance stockholder value. In the summer of 1986, after a proposal to take over Panhandle had been rejected by the company's board, the spin-off at issue was put into place. Specifically, at an August 20, 1986 board meeting, Panhandle declared a dividend of one share of common stock of Anadarko for each share of Panhandle held of record on September 12, 1986. The date on which the dividend of stock was to be distributed was set at October 1, 1986.

As of August 20, 1986, when the spin-off was authorized, Anadarko and Panhandle were parties to numerous long term gas purchase contracts which, in almost all cases, provided for the sale of gas at the maximum lawful price under applicable federal regulations and set minimum annual purchase quantities on a "take-or-pay" basis. Panhandle had similar gas purchase contracts with hundreds of other gas producers. In the early 1980's, with the drop in demand for natural gas, these contracts created problems for Panhandle in at least two respects: (1) because demand was down, Panhandle did not meet its minimum annual purchase requirements and, thus, accrued enormous take-or-pay exposure; and (2) because of the high prices in its gas purchase contracts, Panhandle had difficulty maintaining competitive prices in its sale of gas to customers. To resolve these problems, Panhandle has been attempting to settle its take-or-pay exposure and to negotiate lower purchase prices.

In January, 1986, Panhandle's largest customer, Consumers Power, warned that, at the prices then forecast by Panhandle, it would have to look elsewhere for its gas. In response to this notification, Panhandle embarked upon a Price and Take Relief Program ("PRP") in an effort to obtain from its producers amendments to existing gas purchase contracts which would (a) settle outstanding take-or-pay exposure for approximately 10¢ on the dollar; (b) reduce Panhandle's annual purchase requirement; and (c) adjust the gas purchase price to make the price market sensitive on a permanent basis. Panhandle discussed the PRP with Anadarko beginning in the spring of 1986 and, from Panhandle's perspective, an agreement in principle was reached in July of that year. Anadarko, however, refused to execute the draft submitted by Panhandle. By that time, the spin-off was imminent and Anadarko took the position that the PRP should only be considered in the context of an overall resolution of the terms of the spin-off.

In the beginning of August, 1986, Panhandle instituted what has been called the "$2.21 Program" in furtherance of its goal to offer a competitive price to Consumers Power. The customer had just notified Panhandle that, during the twelve months beginning September 1, it would buy only 70 BCF of gas at the price Panhandle was then forecasting—or approximately half of the amount purchased during the previous year. On the other hand, if Panhandle were able to reduce its price to a specified amount, Consumers Power would buy as much as 180 BCF of gas. With this information, Panhandle went to those of its producers that had not yet agreed to the PRP and sought their participation in the

$2.21 Program. Under this program, producers were asked to agree to reduce their average price of gas to $2.21 per MMBtu on a short-term basis. In return for this price concession, the producers would have more of their gas taken by Panhandle because Panhandle's customer, in turn, would be buying a larger quantity of gas. Producers were told that the projected increase in takes from them would increase their cash flow notwithstanding the reduction in price. Most of the $2.21 agreements allowed the producers to withdraw from the program at any time on thirty days notice, although the form of $2.21 agreement ultimately entered into with Anadarko did not.

According to Panhandle, Anadarko originally was not invited to join the $2.21 Program because Panhandle understood that Anadarko would be participating in the PRP. Anadarko, upon learning of the $2.21 Program, expressed an interest in participating and Panhandle drafted a proposed Reformation Agreement setting forth the terms of the program. Anadarko's board approved the Reformation Agreement on September 11, 1986, although its Chief Executive Officer, Robert J. Allison, Jr. ("Allison"), stated that he would never have approved that agreement or any other if he had known how the issues relating to other spin-off agreements would be resolved later that month.

On September 30, 1986, the Anadarko board of directors met to resolve all the outstanding issues relating to the spin-off. Allison and James T. Rodgers ("Rodgers"), the only member of Anadarko's board of directors not affiliated with Panhandle, objected that the forms of agreement then presented for signature did not accurately reflect the understandings reached by the parties at the September 11th board meeting. Following extended discussions, the parties were unable to agree upon the terms of six agreements (the "Disputed Agreements"): (1) the PRP Agreement; (2) the Reformation Agreement; (3) the Spin-off Agreement; (4) the Sonatrach Registration Agreement; and (5–6) gas purchase contracts covering Matagorda Island Blocks 622 and 623.

Five of the seven Anadarko board members were present at the September 30 meeting. Before the board members voted on the Disputed Agreements, Allison and Anadarko's General Counsel, D.A. Spencer ("Spencer") advised the board that, in their opinion, the Disputed Agreements were unfair to Anadarko and that the board members had fiduciary duties to Anadarko's stockholders which would be breached if the board approved unfair contracts. The Disputed Agreements were voted upon and approved by 3–2 votes (or, in one case, a 3–1 vote with one abstention). The majority votes were cast by three of the Anadarko board members who were also officers or directors of Panhandle—the individual defendants. For purposes of this decision it is not necessary to evaluate the fairness of the Disputed Agreements. Suffice it to say that at least one of the individual defendants conceded that he did not think Panhandle could have obtained Anadarko's approval of the agreements if Anadarko had been an independent company.

While Panhandle and Anadarko were thus engaged in negotiations over the Disputed Agreements and the 48 other agreements entered into in connection with the spin-off, the market started trading in anticipation of the spin-off. An Information Statement dated August 29, 1986 was issued and, on September 8, 1986, Anadarko common stock began trading on the New York Stock Exchange on a "when, as and if issued" basis. As will be discussed hereafter, this market activity is critical to Anadarko's claim and, therefore, warrants some explanation.

Between September 8 and September 30, 1986, Panhandle and Anadarko stock was traded in three ways. First, trades were made on Panhandle stock "regular way" reflecting the combined value of Panhandle and Anadarko. A share traded "regular way" carried with it a "due bill" requiring the seller to deliver to the buyer the dividend of Anadarko stock if and when it was issued. If, for some reason, the Anadarko stock were not issued, the "due bill" would be cancelled. Alternatively, Panhandle stock traded "ex-distribution" reflecting

the value of Panhandle without Anadarko as its subsidiary. Finally, there was trading in Anadarko "when-issued" stock based upon the perceived value of Anadarko as an independent company. As a result of this trading, from and after September 8, 1986, persons and entities other than Panhandle stockholders acquired some interest in Anadarko, albeit contingent upon the issuance of the stock on October 1.

On October 6, 1986, the new board of directors of Anadarko determined that the 54 agreements entered into in connection with the spin-off were unfair to Anadarko and not in its best interests. They unanimously voted to rescind the agreements and gave due notice of their action to Panhandle. Panhandle responded in early December, 1986 by reducing its takes of gas from Anadarko to the minimums established in the various gas purchase contracts as originally executed. However, Panhandle continues to take much higher volumes of gas from Anadarko's competitors pursuant to its $2.21 Program. Panhandle explains the cut backs as being an effort to mitigate damages in the event that Anadarko's decision to rescind the various agreements is upheld.

## II.

The parties agree that the critical issue in this case is whether, at the time the six Disputed Agreements were approved on September 30, Panhandle was both the legal and beneficial owner of all of Anadarko's stock. If so, as Panhandle contends, Anadarko would have no fiduciary duty claim based upon the alleged unfairness of those agreements.

Panhandle argues that, both directly and through its control of Anadarko's board, it owed fiduciary duties only to Panhandle's stockholders. In setting the terms of the spin-off, the individual defendants had a duty to maximize the *combined* value of Panhandle and Anadarko as each company would exist immediately after the spin-off. Assuming the Panhandle directors exercised their business judgment to achieve this result, it is of no consequence whether, in anticipation of the spin-off, they in-

creased or reduced the assets of Anadarko. The Panhandle stockholders who received the dividend of Anadarko stock suffered no injury because, to the extent that Anadarko's value was diminished, Panhandle's was increased. Stated another way, although Panhandle indisputably stood on both sides of the transaction and dictated its terms, it had no obligation to ensure the fairness of the transaction because there were no minority stockholders of Anadarko. *See Sinclair Oil Corporation v. Levien,* Del.Supr., 280 A.2d 717, 720 (1971).

Anadarko acknowledges that, as a general rule, a parent corporation owes no fiduciary duty to its wholly-owned subsidiary. However, by virtue of the when-issued trading in Anadarko stock prior to October 1, 1986, Anadarko contends that outside stockholder interests intervened and Panhandle could no longer treat Anadarko as a wholly-owned subsidiary. Thus, it becomes necessary to analyze the status of purchasers of the when-issued stock vis-a-vis Anadarko prior to October 1.

Although when-issued trading is not a new phenomenon, there appears to be very little authority addressing the rights of purchasers generally and none on the issue presented here. In *Clucas v. Bank of Montclair,* N.J.Ct.E.A., 110 N.J.Law 394, 166 A. 311 (1933), a stockbroker was seeking damages for the refusal of defendant to take delivery of certain when-issued stock. The New Jersey court described the nature of a contract to purchase when-issued stock as follows:

"When issued stock" is not a subscription to stock to be issued. It is treated on the exchanges as an existing property.... [Defendant] by its purchase became obligated to pay for a definite number of shares of stock, provided the corporation completed the necessary steps to issue 10 new shares for each old share then in existence....

Upon receipt of [defendant's] orders, the brokers may contract for the purchase of the "when issued stock" which bound them to make payment for the same when issued.... So far as the parties were concerned, there was a defi-

nite dealing with property as though in existence in accordance with recognized rules. We cannot regard such a purchase as a subscription to something not then in existence, but rather as an agreement to buy a definite stock interest in an existing corporation, provided the directors decided to issue 10 new shares for each old share.

*Id.* 166 A. at 312–313. A similar analysis was provided by a leading commentator:

An agreement for the purchase and sale of a security "when issued" (or "when, as an if issued") is a conditional contract. The parties are bound to perform only if the security is ultimately issued in accordance with some plan or proposal, as yet unconsummated, which is specified in their contract. If the plan or proposal is carried out and the contemplated security issued according to its terms, the seller delivers and the buyer pays; if the security is not issued as contemplated, the parties are returned to the status quo. Unissued securities are traded ... as if they were existing property, and the financial community thinks of the holder of a when-issued contract as the owner of a security, albeit a security yet to be issued, rather than the owner of a chose in action.

Loss and Vernon, *When-issued Securities Trading in Law and Practice*, 54 Yale L.J. 741, 742–743 (1945) (footnotes omitted).

Panhandle focuses on the contingent nature of a "when-issued" trade in support of its position that a purchaser acquires no equitable or beneficial interest in the company's stock until such time as the contingency is fulfilled. It notes that no money or securities change hands on such a trade until the settlement date which, necessarily, is after the date on which the stock is issued. The corporation is not a party to the contingent contract and if, for some reason, the stock is not issued, the purchaser has no claim against the corporation. Thus, although the financial community may treat trading in "when-issued" stock as if it were trading in the security, that trading establishes no relationship between the purchaser and the corporation until such time as the stock is issued.

Anadarko argues that those who purchased Anadarko's stock on a when-issued basis in September, 1986, immediately acquired a definite property interest in the stock and were entitled to be treated as the equitable and beneficial owners of the stock. Anadarko argues that the right to acquire its stock that passed to the purchaser of "when-issued" shares is a recognized aspect of beneficial ownership. *See Sundlun v. Executive Jet Aviation, Inc.,* Del.Ch., 273 A.2d 282 (1970). It then attempts to refute Panhandle's argument as to the contingent nature of the "when-issued" purchase by stating that, even in contingent security issuances, equitable ownership has been recognized. However, the primary case relied upon for this proposition, *Freeman v. Fabiniak*, Del.Ch., Civil Action No. 8035, Hartnett, V.C. (August 15, 1985), does not go so far as Anadarko suggests. In *Freeman*, this Court held:

An option to purchase stock which does not by its terms require the exercise of the option by tender of the purchase price may be exercised and a binding contract formed by an *unconditional* promise to buy the stock in accordance with the option. Because equity regards as done that which ought to be done, a contract for sale of land, chattels or choses in action acts as an equitable conversion. Therefore, once Atlantic Financial exercised its option ... the equitable ownership of the shares passed to it.

*Id.,* slip op. at 20 (emphasis added, citations omitted).

Anadarko also argues that traders of when-issued stock are considered beneficial owners for purposes of Rule 13d–3 of the Securities Exchange Act of 1934. However, beneficial ownership for purposes of the federal securities laws appears to be much broader than the type of beneficial interest recognized for purposes of establishing fiduciary duties under Delaware corporate law. Rule 13d–3(d) provides that a person shall be deemed to be a beneficial owner if he has the right to acquire beneficial ownership of the security within sixty days through the conversion of a security, among other ways. Our courts, by con-

trast, have not recognized any fiduciary duty owing to the holder of a convertible debenture prior to the exercise of the security holder's conversion right. *See Katz v. Oak Industries, Inc.*, Del.Ch., 508 A.2d 873, 879 (1986).

◼ From the analysis above, it appears that Panhandle has the stronger position on the merits. This result finds support by analogy to the rights of a convertible debenture holder. Such a security holder has a contractual right to become a stockholder according to the terms of the governing instrument. However, until he exercises that right, the convertible debenture holder is not considered a legal or beneficial stockholder to whom fiduciary duties are owed. *See Harff v. Kerkorian*, Del.Ch., 324 A.2d 215 (1974), *rev'd on other grounds*, Del. Supr., 347 A.2d 133 (1975); *Norte & Co. v. Manor Healthcare Corp.*, Del.Ch., Civil Action Nos. 6827 and 6831, Berger, V.C. (November 21, 1985).

A convertible debenture holder, like a when-issued purchaser, may be said to have a definite property interest in the stock. The convertible debenture holder may satisfy the contingency on his own by exercising his conversion right, whereas the when-issued purchaser has no power to cause the stock to be issued. This distinction, if anything, would seem to give the convertible debenture holder a greater interest as a future stockholder than the when-issued purchaser.

The analogy certainly is not a perfect one. A convertible debenture holder may never become a stockholder and, prior to conversion, his investment is somewhat protected by the terms of the indenture agreement. Although the when-issued purchaser is unlikely to have similar contractual protections, it would appear that there are avenues of relief available to him. If he trades on the basis of a materially false or misleading information statement issued by the company, it would appear that he would have a viable fraud-on-the-market claim. In addition, as Panhandle points out, the New York Stock Exchange itself could cancel contracts for when-issued securities if it determines either that the plan

pursuant to which the securities were to be issued or the securities themselves have been materially changed. *See N.Y.S.E. Guide* (CCH) ¶ 2137.

◼ Based upon the foregoing, I conclude on a preliminary basis that the when-issued purchasers were owed no fiduciary duties by Anadarko prior to October 1, 1986. That being the case on September 30, 1986, Panhandle was dealing with itself when it caused Anadarko's board to approve the Disputed Agreements and there were no intervening interests of equitable or beneficial stockholders as to whom fiduciary duties were owed. Thus, I find that Anadarko has not shown a probability of success as to Counts I–IV of its Amended Complaint—all of which are based upon the claim that Panhandle breached its fiduciary duty by entering into agreements favorable to Panhandle and unfair to Anadarko.

As to the remaining claim, however, the result is different. In its supplement to the amended complaint, Anadarko alleges that Panhandle is breaching various gas purchase contracts by failing to take ratably from Anadarko as compared with other producers in the same fields.

From the outset, Panhandle has indicated a willingness to take Anadarko's gas ratably—the injunctive relief sought—if Anadarko agrees to abide by the Disputed Agreements. However, as this litigation demonstrates, Anadarko has not agreed to abide by the Disputed Agreements. Although I have now found that Anadarko has not established a probability of success on the merits as to its right to rescind the Disputed Agreements, that decision is not a final judgment and, during the pendency of this litigation, Anadarko would have no protection against Panhandle's reduction in takes absent injunctive relief. In addition, neither the PRP Agreement nor the Reformation Agreement purports to modify the disputed provision in each of the gas purchase contracts that is claimed by Anadarko to require ratable taking. Thus, whether or not the Disputed Agreements ultimately remain in effect, there exists a real dispute as to Panhandle's contractual obligations and Anadarko claims irreparable

harm at least in part as a result of that dispute.

In general, the gas purchase contracts contain two express quantity provisions. Panhandle is obligated to take specified minimum quantities of gas on a monthly basis and, on an annual basis, it must take a specified quantity of gas or, upon failure to do so, pay Anadarko for the short fall (the take-or-pay obligation). As can be seen, these two requirements are minimum quantities and Panhandle may exceed those minimums at any time. Anadarko argues that its contracts require Panhandle to take, in addition to the monthly minimums, that amount of gas that will keep Anadarko ratable with its co-producers and competitors. Panhandle contends that its only obligation in this regard is to avoid inequitable drainage. The disputed contract language provides in relevant part:

> Buyer agrees to use its best efforts in cooperation with Seller to protect against inequitable drainage by the other producer or producers withdrawing gas from the same reservoir. Buyer shall be obligated to take such quantities necessary to protect Seller from inequitable drainage, to the extent that existing facilities can receive such quantities....

Contract between Trunkline and Anadarko covering East Cameron Block 353, Article VI (9). In order to understand the meanings each party gives to this clause, a rudimentary description of the gas production industry is necessary.

All the disputed contracts concern off-shore gas fields. Off-shore gas fields, also known as blocks, are leased from the federal government, usually by several producers. These producers, also known as working interest owners or co-leasees, enter into an operating agreement between themselves. The operating agreement specifies, among other things, each working interest owner's share of drilling and production expenses and gas produced, and designates one of the producers as production manager responsible for drilling and the operation of the wells. In addition, the operating agreement may include what is known as a balancing agreement which provides a method of adjusting differences between the amount of gas produced by each working interest owner and its stated percentage interest in the lease. Generally, a balancing agreement provides that the adjusting payments be made after a reservoir has been totally drained.

In arranging for the purchase of their gas, the working interest owners contract separately with the pipeline companies. Even where the same pipeline contracts with most or all of the working interest owners in a given field, it appears that the terms of the gas purchase contracts may differ as to the pipeline's take obligations and the price to be paid, among other things.

Within a given field, there are often numerous gas reservoirs. Some of those reservoirs may be located entirely within the field, while others may extend into an adjoining field. In the case of a reservoir that crosses lease lines, two different groups of working interest owners may be producing gas from the same reservoir. In those circumstances, the well that is producing at a higher rate ultimately will recover more of the gas in the reservoir because the gas will migrate towards the area of reduced pressure created by the more productive well.

With this limited background, the parties' contentions will be considered. Panhandle claims that the cited contract provision is a drainage clause. It asserts that the term "drainage," as used in the contract or in the gas industry generally, means "the movement of gas from one portion of a reservoir underlying one block or lease to a portion of the same reservoir underlying an adjacent block or lease...." Defendants' brief at p. 82. In other words, "drainage means only across lease-line migration...." *Ibid.*

A drainage clause, says Panhandle, is entirely different from a ratable take clause which, both parties agree, would require the pipeline to take proportionately or ratably from the co-leasees in a single field. Panhandle offers the following in support of its position: (1) several experts' opinions that the clause does not require

ratable taking; (2) the fact that the clause in question does not use the term "ratable take" whereas other gas purchase contracts between the parties do expressly use that phrase; (3) the fact that co-leasees have it within their power and, in some cases, do protect themselves from disproportionate production of gas through balancing agreements and (4) the fact that the disputed clause does not contain any standard against which a ratable take obligation, if there were one, could be measured (i.e., percentage of deliverability).

Anadarko offers similar support for its opposing view: (1) expert opinions directly contradicting those of Panhandle's experts; (2) the fact that the clause in question speaks of inequitable drainage by other producers without limitation, whereas in other contracts between the parties there was express provision for cross lease line drainage; (3) the fact that Anadarko does not have balancing agreements in all cases and, even where it does, the balancing agreements provide only minimal protection because payments are made many years in the future and without interest.

In addition, Anadarko points out that, for the past 10 or more years since these contracts have been in place, Panhandle has been taking ratably. Not only that, contract summaries routinely prepared by Anadarko when the contracts were made—and when, incidently, defendant Dixon was Anadarko's president—signify that the contracts are ratable take. Finally, Anadarko argues that the ambiguity in the disputed clause must be resolved against Panhandle, as the party that drafted the gas purchase agreement. *Philadelphia Storage Battery Co. v. Radio Corporation of America*, Del.Ch., 194 A. 414, 419 (1937), *aff'd*, Del.Supr., 6 A.2d 329 (1938); *Goodman v. Continental Casualty Co.*, Del.Super., 347 A.2d 662, 665 (1975).

■ After considering the conflicting evidence, I am satisfied that Anadarko has established a probability of success on the merits as to its contract interpretation. The experts on both sides have impressive credentials and, in the absence of any other evidence in the record, it would be difficult to decide which ones to accept. The balancing agreement issue, likewise, appears to be a close question. The evidence suggests that, as Anadarko argues, balancing agreements do not provide anywhere near complete relief for discrepancies in the co-leasees' production rates. On the other hand, it may be a fact of life in the industry that production imbalances will occur and will not be fully compensated. The fact that each side was able to cite to another contract where there was express language to the effect that drainage was across lease lines or where ratable taking was required merely convinces the Court that the provision in question is ambiguous. Thus, the balance begins to tip in favor of Anadarko on the basis that ambiguities will be construed against the party that drafted the agreement.

The most telling evidence, however, is the actual performance over more than a decade and the contract summaries. Panhandle attempts to explain the fact that it has taken ratably in the past as being its policy rather than any contractual obligation. That explanation might be given more weight were it not for the designation in the contract summaries that the contracts contained ratable take requirements. Panhandle offered no satisfactory basis on which the Court should disregard this evidence. Based upon the foregoing, I conclude preliminarily that Anadarko has established a likelihood of success on the merits.

In order to obtain injunctive relief, Anadarko must also show that it is threatened with imminent irreparable harm and that the balance of equities weighs in its favor. Anadarko's claim of irreparable harm is based upon the type of reservoirs affected by Panhandle's gas cut backs. · The evidence establishes that most of these reservoirs are water drive. Specifically, Anadarko's expert, Bill Hise ("Hise"), analyzed various relevant data and concluded that, of the twenty-three reservoirs underlying the fields in question, eighteen are water drive. The producing mechanisms of the other five have not been conclusively determined, but according to Hise, all of the

available facts indicate that they are at least partial water drive reservoirs.

■ In a water drive or partial water drive reservoir, as gas is removed, water moves into the area of reduced pressure and replaces the gas. Inevitably, as this happens, some of the gas forms pockets and is trapped by the incoming water. This process is known as water encroachment. In order to recover the greatest possible quantity of the reserves in a water drive reservoir, it is standard industry practice to produce the gas from such reservoirs at the highest possible rate consistent with good engineering. If the gas from water drive reservoirs is not produced at the highest safe rate, a greater portion than necessary of the reserves will be trapped by water encroachment. Anadarko has produced expert testimony, not effectively refuted, that it is impossible to measure the amount of gas thus trapped with any accuracy.

Anadarko's experts also opined that gas trapped by water encroachment is permanently lost. Panhandle's experts do not unequivocally dispute this conclusion, noting that ultimate recovery *may* not be affected. *See* Reply Affidavit of Coley Ronald Platt, ¶ 6. Both Platt and Hise make reference to two articles discussing a method of recovering trapped gas through extremely rapid production rates. Although this method of gas recovery apparently has been successful in certain cases, there is nothing in this record to support a conclusion that such a procedure could be accomplished in the reservoirs at issue. Moreover, it seems that this process is only viable in cases where very large quantities of gas have been trapped by water encroachment, since the costs involved are likely to be dramatically higher than normal production costs. In addition, even Panhandle seems to concede that there would be no way of accurately determining the percentage of the trapped gas recovered by this means. Thus, there would still be an unquantifiable loss of gas reserves and the consequent irreparable harm.

Panhandle attempts to refute the claim of irreparable injury by pointing out that the amount of gas it has taken from Anadarko in December, 1986 meets or exceeds the volumes taken during most of the preceeding three and one-half years and that, during that period, Anadarko did not write down its gas reserves in its federal securities filings. While both of these statements appear to be factually accurate, I am not persuaded that they defeat Anadarko's claim of irreparable harm. On the first point, it appears that gas producers often are subjected to the irretrievable loss of a portion of their reserves because their contracts do not require the pipeline company to purchase at 100% of the wells' deliverability. Thus, Panhandle's comparison between current and past rates of taking is of limited significance. As to Anadarko's failure to write down its gas reserves during the past three years, Anadarko has provided a plausible explanation. It states that, for reporting purposes, reserves are estimated on an extremely conservative basis and, as a result, the fact that no write down has been taken, does not necessarily indicate that there has been no loss in gas reserves.

Finally, Panhandle argues that Anadarko has the right to sell its gas on the spot market and thereby avert any irreparable harm. However, the evidence indicates that before gas may be released for sale on the spot market, certain regulatory procedures must be accomplished and Panhandle appears to acknowledge that these regulatory obstacles prevent the spot market sale from being a viable alternative remedy.

In balancing the equities, the Court is satisfied that Anadarko has the stronger position. This is so because, not only has Anadarko been injured, but the public interest has been injured as well. Natural gas is a limited and critically important resource which must be protected where possible. Panhandle's only argument on this point is that, if it is required to take ratably from Anadarko, it may be required to do so with all of its other producers as well. The short answer to this contention is that this Court does not purport to pass upon any of Panhandle's contracts with

other producers and this is a preliminary decision, in any event.

Arrangements will be made to consider a form of injunctive order and the amount of the bond on Tuesday, January 20, 1987 and, in light of Anadarko's representations at the close of oral argument, reserves will be used as the basis for determining ratability.